UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH

| | |
|---|---|
| CHRISTOPHER JOY ] | |
| Plaintiff ] | |
| ] | |
| V. ] | |
| ] | **COMPLAINT** |
| ] | |
| COUNTRYWIDE ] | |
| FINANCIAL CORPORATION, a ] | Case Number 5:10-cv-218 |
| Delaware corporation; ] | |
| COUNTRYWIDE HOME LOANS, ] | |
| a New York corporation; ] | |
| DECISION ONE MORTGAGE ] | |
| COMPANY, LLC, a North Carolina ] | |
| corporation; NATIONWIDE ] | |
| TRUSTEE SERVICES, INC, a ] | JURY TRIAL DEMANDED |
| Georgia corporation; MONICA ] | |
| WALKER, an individual; ANNE ] | |
| LANCASTER, an individual; DIXIE ] | |
| MADDREY TEAM; and DOES ] | |
| 1-10, inclusive ] | |
| Defendants ] | |

Plaintiff, Christopher Joy, a North Carolina resident, by and through his attorneys Karen

S. Schuller and Harold E. Lucas, Jr., alleges the following upon information and belief:

DEFENDANTS AND VENUE

This case is brought under 28 U.S.C. §§ 1331 and 1332; Title I of the Consumer Credit

Protection Act, as amended 15 U.S.C. § 1601, implemented by 12 CFR part 226, known

as "Regulation Z" otherwise known as the Truth-in-Lending Act, diversity of parties and

North Carolina state claims of trespass, conversion and unfair and deceptive trade

practices.

1. At all relevant times, defendant Countrywide Financial Corporation ("CFC"), a Delaware corporation, transacted business throughout the State of North Carolina, including Wake County. CFC has since been bought by Bank of America.

2. At all relevant times, defendant Countrywide Home Loans ("CHL"), a New York corporation, transacted business throughout the State of North Carolina, including Wake County. CHL is a subsidiary of CFC. These two defendants are collectively known as "Countrywide".

3. At all relevant times, defendant Decision One Mortgage Company, LLC ("DOMC"), a North Carolina corporation, transacted business throughout the State of North Carolina, including Wake County.

4. At all relevant times, defendant Nationwide Trustee Services, Inc. ("NTS"), a Georgia corporation, transacted business throughout the State of North Carolina, including Wake County.

5. At all relevant times, defendant Monica Walker ("Walker") was an employee or agent of defendant Nationwide Trustee Services, Inc. ("NTS"), a Georgia corporation, and transacted business throughout the State of North Carolina, including Wake County. Walker's office is in Atlanta, Georgia.

6. At all relevant times, defendant Anne Lancaster ("Lancaster") was an employee or agent of defendant Dixie Maddrey Team ("Maddrey"), a North Carolina entity that transacted business in Wake County.

7. At all relevant times, Dixie Maddrey Team ("Maddrey") was a North Carolina entity that transacted business in Wake County.

8. Plaintiff is not aware of the true names and capacities of the defendants sued as DOES 1-10, inclusive, and therefore sues these defendants by such fictitious names. Each of these fictitiously named defendants is responsible in some manner for the activities alleged in this Complaint. Plaintiff will amend this Complaint to add the true names of the fictitiously named defendants once they are discovered.

9. The defendants identified in paragraphs 1 through 8 above, shall be referred to collectively as "Defendants."

10. Whenever reference is made in this Complaint to any act of any defendant(s), that allegation shall mean that each such defendant acted individually and jointly with the other defendants.

11. Any allegations about acts of any corporate or other business defendants means that the corporation or other business did the alleged acts through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

12. At all relevant times, each defendant committed acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the defendants acted as the agent of the other defendants, and all of the defendants acted within the scope of their agency if acting as the agent of another.

13. At all relevant times, each defendant knew or realized that the other defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that other defendants were engaging in or

planning to engage in unlawful conduct, each defendant nevertheless facilitated the commission of those unlawful acts. Each defendant intended to and did encourage, facilitate or assist in the commission of the unlawful acts, and thereby aided and abetted the other defendants in the unlawful conduct.

14. At all relevant times, defendants engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which was to engage in the violations of law alleged in this Complaint. This conspiracy, common enterprise and common course of conduct continues to the present.

**COUNT I. COUNTRYWIDE AND DOMC ENGAGED IN DECEPTIVE AND UNFAIR TRADE PRACTICES IN THE SALE OF A COMPLEX AND RISKY LOAN TO PLAINTIFF.**

15. This action is brought against defendants Countrywide and DOMC, who engaged in unfair and deceptive trade practices, violation of truth-in-lending laws, false advertising and unfair competition in the origination of residential home mortgages. It is also brought against the additional defendants for abuse of process and unfair foreclosure procedures.

16. Countrywide originated mortgage loans through several channels, including a wholesale origination channel and a retail origination channel. The Countrywide employees who marketed, sold or negotiated the terms of mortgage loans in any of its origination channels, either directly to consumers or indirectly by working with mortgage brokers such as DOMC, are referred to herein as "loan officers."

17. In Countrywide' wholesale channel, loan officers in its Wholesale Lending Division ("WLD") and Specialty Lending Group ("SLG") worked closely with a

nationwide network of mortgage brokers to originate loans. In its wholesale channel, Countrywide often did business as "America's Wholesale Lender," a fictitious business name owned by CHL. Loan officers employed by Decision One Mortgage Company sold loans directly to consumers as part of Countrywide's retail channel.

18. Countrywide maintained sophisticated electronic databases by means of which corporate management could obtain information regarding Countrywide loan production status, including the types of loan products, the number and dollar volume of loans, the underwriting analysis for individual loans, the number of loans which were approved via underwriting exceptions. Defendants used this information, together with data they received regarding secondary market trends, to develop and modify loan products that Countrywide offered and the underwriting standards that Countrywide applied.

19. In or about 2003, the mortgage market changed from one in which lenders originated mortgages for retention in their own portfolios to one in which lenders attempted to generate as many mortgage loans as possible for resale on the secondary mortgage market. The goal for Countrywide and DOMC was not only to originate high mortgage loan volumes but also to originate loans with above-market interest rates and other terms which would attract premium prices on the secondary market.

20. In 2004, in an effort to maximize Countrywide's profits, defendants set out to double Countrywide's share of the national mortgage market to 30% through a deceptive scheme to mass produce loans for sale on the secondary market.

Defendants viewed borrowers as nothing more than the means for producing more loans, originating loans with little or no regard to borrowers' long-term ability to afford them and sustain homeownership. This scheme was known, enabled and implemented with the assistance of defendant DOMC.

21. Defendants, including DOMC, implemented this deceptive scheme through misleading marketing practices designed to sell risky and costly loans to homeowners, the terms and dangers of which they did not understand, including by (a) advertising that it was the nation's largest lender and could be trusted by consumers; (b) encouraging borrowers to refinance or obtain purchase money financing with complicated mortgage instruments like hybrid adjustable rate mortgages or payment option adjustable rate mortgages that were extremely difficult for consumers to understand; (c) marketing these complex loan products to consumers by emphasizing the very low initial "teaser" or "fixed" rates while obfuscating or misrepresenting the later steep monthly payments and interest rate increases or risk of negative amortization; and (d) routinely soliciting borrowers to refinance only a few months after Countrywide or the loan brokers with whom it had "business partnerships" had sold them loans.

22. Defendants also employed various lending policies to further their deceptive scheme and to sell ever-increasing number of loans, including (a) the dramatic easing of Countrywide's underwriting standards; (b) the increased use of low- or no-documentation loans which allowed for no verification of stated income or stated assets or both, or no request for income or asset information at all; and (c)

urging borrowers to encumber their homes up to 100% (or more) of the assessed value.

23. Also to further the deceptive scheme, defendants created a high-pressure sales environment that propelled its branch managers and loan officers to meet high production goals and close as many loan as they could without regard to the borrower's ability to repay. Defendants' high-pressure sales environment also propelled loan officers to sell the riskiest types of loans, such as payment option and hybrid adjustable rate mortgages, because loan officers, including DOMC, could easily sell them by deceptively focusing borrowers' attention on the low initial monthly payments or interest rates. Defendants also made arrangements with a large network of mortgage brokers (such as defendant DOMC) to procure loans for Countrywide and, through its loan pricing structure, encouraged these brokers to place homeowners in loans with interest rates higher than those for which they qualified, as well as prepayment penalty obligations. This system of compensation aided and abetted brokers in breaching their fiduciary duties to borrowers by inducing borrowers to accept unfavorable loan terms without full disclosure of the borrowers' options and also compensated brokers beyond the reasonable value of the brokerage services they rendered.

24. Countrywide received numerous complaints from borrowers claiming that they did not understand their loan terms. Despite these complaints, defendants turned a blind eye to the ongoing deceptive practices engaged in by Countrywide's loan officers and loan broker "business partners" (DOMC) as well as to the hardships created for borrowers by its loose underwriting practices. Defendants cared only

about selling increasing numbers of loans at any cost, in order to maximize Countrywide's profits on the secondary market.

25. Countrywide directly and indirectly motivated its branch managers, loan officers and brokers (including defendant DOMC) to market the loans that would earn the highest premium on the secondary market without regard to the borrower's ability to repay. The value on the secondary market of the loans generated through broker and loan officers was an important factor in determining the brokers and loan officer's compensation. Managers were highly motivated to pressure their loan officers and brokers to sell loans that would earn Countrywide and DOMC the highest premium on the secondary market, which resulted in aggressive marketing of such loans to consumers.

26. The secondary market affected Countrywide's and DOMC's pricing of products and, in order to sell more loans on the secondary market, Countrywide and DOMC relaxed its underwriting standards and liberally granted exceptions to those standards.

27. Countrywide and DOMC offered a variety of loan products that were both financially risky and extremely difficult for borrowers, including the plaintiff, to understand, including in particular, payment option and hybrid adjustable rate mortgages.

28. Countrywide typically offered "3/27" Hybrid ARMs through its broker partner defendant DOMC and offered and sold such a Hybrid ARM to Plaintiff. A copy of the Plaintiff's Adjustable Rate Note is attached hereto, incorporated herein and marked Exhibit "A".

29. These 3/27 ARM loans have low, fixed interest rates for the first three years. In Plaintiff's case, the initial rate was 6.5% with monthly payment of $1668.66.

30. After the initial rate expires, the interest rates can adjust once every six months for the next 27 years. During this period, the interest rate is typically determined by adding a margin to the six-month LIBOR index, except that the amount the interest rate can increase is 1% every six months or 2% each year. Because the initial rate is set independent of the index, the payment increase can be dramatic. This results in payment shock. A copy of Plaintiff's Adjustable Rate Rider is attached hereto, incorporated herein and marked Exhibit "B".

31. During the underwriting process, Countrywide and defendant DOMC did not consider whether borrowers, including the Plaintiff, would be able to afford such payment. Further, because of Plaintiff's finances, even interim increases to the initial rate caused dramatic hardship to Plaintiff. (Plaintiff's monthly payments went from $1664 to $2531 to $3048 in a five-month period).

32. Plaintiff's Note reflected an initial interest payment of 6.50% and at the first change date (November 1, 2007), the rate went to 9.50% although the Note allows a 6.25% *increase* to the current index before each change date.

33. Countrywide underwrote and defendant DOMC executed Plaintiff's 3/27 ARM based on the payment required while the initial rate was in effect, without regard to whether Plaintiff could afford the loan thereafter. Additionally, Plaintiff's 3/27 ARM contained significant prepayment penalties.

34. Plaintiff was therefore subjected to steadily increasing monthly payment as well as payment shock. His initial rate of 6.50% was recalculated at the initial change

date by adding a margin of 6.25% to the six-month LIBOR index. The Note provides that the interest rate can never be lower than 6.50% and can go as high as 12.50%.

35. Countrywide and DOMC marketed the Hybrid ARM to Plaintiff by emphasizing the low monthly payment and low "fixed" initial interest rate. Countrywide and DOMC misrepresented or obfuscated the true terms of this loan, including but not limited to, misrepresenting or obfuscating the amount of time that the fixed rate would be in effect and misrepresenting or obfuscating the amount by which payments could increase once initial fixed rate period had expired.

36. Countrywide and DOMC, its business partner broker, also misrepresented and obfuscated the fact that Plaintiff's Note included significant prepayment penalties.

37. Countrywide and DOMC also misrepresented or obfuscated how difficult it would be for Plaintiff to refinance his Hybrid ARM. Although Plaintiff was assured that he would be able to refinance, because of very high loan-to-value ratio and significant prepayment penalties, refinancing of Plaintiff's home was next to impossible. The Note was secured by a Deed of Trust, a copy of which is attached hereto, incorporated herein and marked Exhibit "C".

**COUNT II. NATIONWIDE TRUSTEE SERVICES AND MONICA WALKER ABUSED THE PROCESS OF THE COURTS BY INTENTIONALLY FORECLOSING ON PLAINTIFF WITHOUT STATUTORY NOTICE AND DECEIVING THE CLERK OF COURT.**

38. Paragraphs 1 through 37 are incorporated herein as though fully set forth.

39. On or about September 9, 2008, defendants NTS and Walker notified Plaintiff that a hearing would be held on October 16, 2008 pursuant to a Notice of Hearing, on whether Plaintiff's Deed of Trust ("DOT") would be foreclosed.

40. On October 16, 2008, Plaintiff went to the Clerk of Court's office, in Wake County North Carolina, and was told by Walker or another agent or employee of defendant NTS that a hearing would not be held that day. Defendants failed to notify Plaintiff of any other date for continuance.

41. On January 8, 2009, at 11:11 am, defendants filed an Order that they prepared stating that "the debtors have shown no valid legal reason why foreclosure should not commerce." Defendants knew that they had not given statutory notice to the Plaintiff at the time such Order was submitted to the Clerk. A copy of said Order is attached hereto, incorporated herein and marked Exhibit "D".

42. On February 12, 2009, Defendants sent a letter to the Clerk of Court for Wake County purporting to enclose a Final Report and Accounting of Sale. Defendants knew that they had sent no notice of any kind to Plaintiff yet represented to the Court that they had done so. A copy of said letter is attached hereto, incorporated herein and marked Exhibit "E".

43. On February 24, 2009, defendants attempted to submit an Accounting Checklist for Foreclosure Final and the Clerk of Court refused it because defendants had not notified Plaintiff of any sale or of any hearing for January 8, 2009. A copy of said Accounting Checklist is attached hereto, incorporated herein and marked Exhibit "F".

44. On March 9, 2009, defendants sent Plaintiff a letter stating that a foreclosure sale of Plaintiff's property had been conducted on January 29, 2009 and demanded possession of the property. Defendants attempted to get the Plaintiff to consensually surrender possession although defendants knew that the purported sale was illegal. A copy of such letter is attached hereto, incorporated herein and marked Exhibit "G".

45. On March 31, 2009, defendants engaged in a myriad of filings attempting to obscure their illegal acts, to wit, defendants filed another Accounting Checklist for Foreclosure that appears to be to have been supported by what defendants knew to be an unsigned Order of Continuance (which was not filed until March 31, 2009 at 11:47 am) for a hearing that was scheduled for January 8, 2009. This lack of notice to the Plaintiff and his resulting failure to appear at a hearing to which he had no knowledge is the basis for the previous Order of January 8, 2009 giving defendants the right to proceed on foreclosure and Sale of Plaintiff's property on January 29, 2009. In other words, defendants mislead the Clerk to believe that a signed lawful Notice of Continuance had in fact been filed and served upon Plaintiff. A copy of the unsigned Order of Continuance is attached hereto, incorporated herein and marked Exhibit "H". A copy of the Accounting Checklist for March 31, 2009 is incorporated herein and marked Exhibit "I".

46. On March 31, 2009, at 11:46 am, Defendants compounded their abuse of process by submitting to the Clerk an Affidavit of Missing Continuance that states they were missing a filed copy of a 'continuance package' submitted "back in November 2008" and that the package is hereby submitted with the Affidavit.

Again, what defendants attempted to submit was a fictitious Notice of Continuance made to look like an original. It is noted that this Affidavit is not dated at all. A copy of said Affidavit is attached hereto, incorporated herein and marked Exhibit "J" A copy of the fictitious Notice of Continuance is attached hereto, incorporated herein and marked Exhibit "K".

47. The Clerk of Court who filed these foregoing documents on March 31, 2009, sometime in the morning, signed her initials 'SP" and refused to allow the filing of the Checklist because of the unsigned and 'missing' Notice of Continuance.

48. Defendants, desperate to defraud the Court for the sake of a Sale that had already illegally been performed by them on January 29, 2009, again returned to the Clerk's office on the same day in the afternoon of March 31, 2009 at 3:30 pm, and went to a different Clerk, who had no knowledge of the foregoing, and submitted another Accounting Checklist, while purporting to comply with all statutory requirements although defendants knew the intentional misrepresentation that they had perpetrated on the Court and the Plaintiff. A copy of the fraudulent Accounting Checklist is incorporated herein and marked Exhibit "L".

49. On March 31, 2009, defendants NTS and Monica Walker intentionally caused to be filed a Notice of Continuance indicating a new hearing date of January 8, 2009.

50. On March 31, 2009, defendants NTS and Walker intentionally filed an Order of Continuance that was neither signed by anyone nor dated any date.

51. After receiving an Order of Sale, defendants NTS and Walker intentionally delivered the Note and Deed of Trust on January 29, 2009 to the Holder of the Note, the Bank of New York, fraudulently dispossessing Plaintiff of his home.

52. Defendants NTS and Walker intentionally or with gross negligence never served Plaintiff in any manner with a copy of the Order of Sale, Notice of Sale, Report of Sale or anything else, all in violation of the General Statutes of North Carolina. Further, defendants NTS and Walker Plaintiff intentionally failed to notify Plaintiff of any other proceedings in the foreclosure matter until he finally received a Notice of Eviction from the Wake County Sheriff.

53. When Plaintiff received the Notice of Eviction, and the Sheriff placed an eviction notice upon the dwelling, he was required to move within 2 days.

54. This move cost the Plaintiff considerable expense, including the loss of his home based business, a limousine service.

55. Plaintiff hired an attorney, at considerable expense, and after approximately two months after the eviction, successfully got a court order to return the keys to his dwelling and the return of the Deed of Trust. A copy of said Order is attached hereto, incorporated herein and marked Exhibit "M".

56. As a result of the deliberate, intentional and grossly negligent acts of defendants NTS and Walker, Plaintiff suffered harm to his reputation, extreme embarrassment, emotional distress, unlawful trespass upon his property and the loss of considerable amounts of monies.

57. Defendants NTS and Walker were motivated by greed in that they received monies from the Trustee and Note Holder, Bank of New York for their actions.

## COUNT III. DEFENDANTS DIXIE MADDREY AND ANNE LANCASTER INTENTIONALLY CONVERTED PROPERTY OF THE PLAINTIFF WHEN THEY CLEANED OUT THE DWELLING WHILE PLAINTIFF WAS UNLAWFULLY EVICTED.

58. Paragraph 1-57 are incorporated herein as though fully set forth.

59. Defendants Maddrey and Lancaster executed a form Landlord Request To Sheriff For Locking Of Premises ("Request") on May 1, 2009. A copy of said Request is attached hereto, incorporated herein and marked Exhibit "N".

60. The Request executed by defendants Maddrey and Lancaster states that they will allow Plaintiff's personal property to remain on the premises and that they will release the property upon the request of the Plaintiff.

61. Defendants Maddrey and Lancaster were responsible for the safe keeping of Plaintiff's personal property at the premises.

62. Defendants Maddrey and Lancaster were the only persons with access to the premises after the May 1, 2009 eviction.

63. When Plaintiff returned to his premises to claim his remaining personal property, he discovered significant items of substantial value had disappeared.

64. Defendants Maddrey and Lancaster trespassed upon Plaintiff's property and intentionally or while being grossly negligent caused the disappearance of a significant part of Plaintiff's personal property while "cleaning out" the vacated premises.

65. Wherefore, Plaintiff respectfully requests this Honorable Court to issue judgment upon the failed bailment of Plaintiff's property.

## COUNT IV. DOMC AND COUNTRYWIDE VIOLATED FEDERAL TRUTH-IN-LENDING LAWS (TILA).

66. Paragraphs 1-65 are herein incorporated as though fully set forth.

67. Defendants CFC, CHL and DOMC violated Title I of the Consumer Credit Protection Act, as amended 15 U.S.C. § 1601, implemented by 12 CFR part 226, known as "Regulation Z".

68. 12 CFR § 226.19 requires that certain mortgage and variable-rate transactions in a mortgage transaction subject to the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) that is secured by the consumer's dwelling, like Plaintiff's, defendants CFC, CHL and DOMC make good faith estimates of the disclosures required by § 226.18 and shall deliver or place them in the mail not later than the third business day after the creditor receives the consumer's written application. Defendants failed to provide this disclosure to Plaintiff.

69. 12 CFR § 226.19(2)(ii) requires that if the annual percentage rate disclosed under paragraph (a)(1)(i) of this section becomes inaccurate, as defined in § 226.22, the creditor shall provide corrected disclosures with all changed terms. The consumer must receive the corrected disclosures no later than three business days before consummation. At some point during the tenure of the loan to Plaintiff, the annual percentage rate changed. The defendants did not notify Plaintiff of this change within 3 business days.

70. 12 CFR § 226.19(4) requires that disclosures made pursuant to paragraph (a)(1) or paragraph (a)(2) of this section shall contain the following statement: "You are not required to complete this agreement merely because you have received these

disclosures or signed a loan application." It also requires that the disclosure required by this paragraph shall be grouped together with the disclosures required by paragraphs (a)(1) or (a)(2) of this section. The defendants did not give this statement to the Plaintiff.

71. 12 CFR § 226.32(c)(1) required the defendant to make the following statement: "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do no meet your obligations under the loan." Defendants failed to provide Plaintiff with such a statement.

72. Under 12 CFR § 226.32(d), the mortgage consummated by defendants could not contain prepayment penalties unless as stated in 12 CFR § 226.32(c)(6) and except as allowed under paragraph (d)(7) of this section. A prepayment penalty includes computing a refund of unearned interest by a method that is less favorable to the consumer than the actuarial method, as defined by section 933(d) of the Housing and Community Development Act of 1992, 15 U.S.C. § 1615(d).

73. Plaintiff's mortgage included prepayment penalties that violated 12 CFR § 226.32(d)(7)(iii) because at consummation, the Plaintiff's total monthly debt payments (including amounts owed under the mortgage) exceeded 50 percent of the Plaintiff's monthly gross income. Plaintiff's income was not verified by defendant in accordance with § 226.34(a)(4)(ii).

74. Defendants' acts violated § 226.34(a)(4) in that they extended credit to Plaintiff that was not based on the value of the Plaintiff's collateral without regard to the

Plaintiff's repayment ability as of consummation, including the Plaintiff's current and reasonably expected income, employment, assets other than the collateral, current obligations, and mortgage-related obligations.

75. Under § 226.34(a)(4)(ii), the defendant must have verified the Plaintiff's repayment ability as follows: (A) A creditor must verify amounts of income or assets that it relies on to determine repayment ability, including expected income or assets, by the consumer's Internal Revenue Service Form W-2, tax returns, payroll receipts, financial institution records, or other third-party documents that provide reasonably reliable evidence of the consumer's income or assets.

76. Defendant failed to verify Plaintiff's repayment ability pursuant to the statute in that no tax returns were requested, no W-2s were requested, no third party documents that provided reasonable reliance on Plaintiff's income or assets were requested.

77. Under § 226.34(a)(4)(C), defendants were required to verify the Plaintiff's current obligations. No such verification was requested or undertaken by the defendants.

WHEREFORE, Plaintiff demands judgment against the defendants for the foregoing violations of law and respectfully requests this Honorable Court to:

1) award damages in excess of $75,000 and find that Countrywide and DOMC engaged in unfair and deceptive trade practices and violations of the federal Truth-In-Lending Statutes;

2) award damages in excess of $75,000 and find that NTS and Walker abused the process of the courts and engaged in trespass to Plaintiff's property and converted Plaintiff's property for themselves and others for monies;

3) award damages in excess of $75,000 and find that Maddrey and Lancaster engaged in trespass of Plaintiff's property and conversion of Plaintiff's personal property;

4) find that compensatory and punitive damages are just and necessary;

5) award attorneys' fees and costs of suit to Plaintiff;

6) award any other equitable relief this Honorable Court may deem just.


Respectfully submitted:

The Plaintiff by his attorneys:

*/s/_Karen S. Schuller*  */s/_H.E. Luke Lucas, Jr.*

Karen S. Schuller, Esquire
200 HOMESTEAD PARK DRIVE
APEX, NC 27502
919-308-7800
karenschuller@gmail.com
NC Bar # 39276

H.E. Luke Lucas, Jr., Esquire
2631 E. GEER ST.
DURHAM, NC 27704
919-237-1934
lucasandnowak@nc.rr.com
PA Bar # 61124

Attorneys for Plaintiff Christopher Joy